James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

FOOD FAIR STORES, INC., Defendant.

Civ. A. No. 68-269.

United States District Court, M. D. Pennsylvania.

July 9, 1971.

Charles Donahue, Louis Weiner, Marshall H. Harris, U. S. Dept. of Labor, Philadelphia, Pa., for plaintiff.

Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., Kleinbard, Bell & Brecker, Philadelphia, Pa., for defendant.

## OPINION

MUIR, District Judge.

The Secretary of Labor seeks by this action to enjoin Food Fair from violating the Equal Pay Provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. Jurisdiction is conferred on this Court by 29 U.S.C. § 217.

Section 29 U.S.C. § 206 provides in part, as follows:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

Deleting from this section language which has no vitality with respect to this action, the statute would read as follows: "No employer * * * shall discriminate * * * between employees on the basis of sex by paying wages to employees * * * at a rate less than the rate at which he pays wages to employees of the opposite sex * * * for equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." The statutory exceptions relating to (i) seniority systems, (ii) merit systems, or (iii) systems measuring earnings by quantity or quality are not applicable to this case. The fourth exception, "a differential based on any other factor other than sex", is a Congressional pleonasm. In my view, it is impossible for an employer to discriminate between employees on the basis of sex "except where such payment is made pursuant

to * * * (iv) a differential based on any other factor other than sex." Were it not for Shultz v. Wheaton Glass Company, 421 F.2d 259 (3d Cir. 1970) certiorari denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64, I would hold the fourth exception to be a meaningless tautology.

The Secretary of Labor claims that Food Fair has discriminated against female cashiers by paying them at rates less than the pay rates for male cashiers. For the last few years, the male cashiers have been designated as clerk-checkers and the female cashiers have been designated as checkers.

The Secretary of Labor also seeks the payment of the wage differential resulting from the violation of the statute. Testimony in this case dealt only with Defendant's stores in West Hazleton and Scranton, Pennsylvania. The stores are unionized.

■ The obvious purpose of the Equal Pay Act is to correct discriminatory wage practices having a burdensome effect on the economy and on the living standards of workers. Shultz v. Wheaton Glass Company, supra.

The Secretary of Labor has proven here that females received lesser wages than males for performing equal work, under similar conditions, on jobs requiring equal skill, effort, and responsibility.

Under the 1963–1965 collective bargaining agreement applicable to this case, there were separate wage schedules for male and female clerks. The agreement established higher wage rates for male clerks than for female clerks. Subsequent collective bargaining agreements removed the specific sex label and purported to establish new categories of checker and clerk-checker. Only male employees have been employed as clerk-checkers since 1965 and only female employees have been engaged as checkers since that date.

Notwithstanding these new titles, the duties of the male and female employees remained the same.

All non-management male employees were designated clerk-checkers, although there was a well-established operational breakdown of clerk checkers into grocery clerks, produce clerks, and cashiers.

Defendant has attempted to justify the differential favoring cashier clerk-checkers (males) on the basis of their asserted performance of the miscellaneous tasks in addition to cashiering operations. The defendant in particular maintains that the clerk-checkers were engaged in performing the following duties, in addition to checking, registering, and bagging customers' purchases: (a) loading L trucks in the receiving area, taking them to customer counters and unloading them, stamping prices on goods and placing them on counters; (b) hanging signs on store windows; (c) changing fluorescent lights in the ceiling; (d) loading ice on produce counters; (e) shoveling snow from sidewalks; (f) retrieving store carts from the store parking lots; (g) relieving grocery clerks during vacations, personal holidays, illnesses and other temporary vacancies; (h) removing produce from the produce shelves at night; (i) mopping floors and cleaning rest room facilities; (j) loading purchases into customers' cars; and (k) assisting in manager's office.

Female clerks also performed miscellaneous subsidiary activities in addition to their cashiering operations, such as: (a) straightening and taking care of candy, cigarette and tobacco racks; (b) straightening, stocking and ordering drug and spice supplies, including unloading and lifting crated drug supplies; (c) collecting shopping carts from the interior and exterior of the establishments; (d) unpacking, marking, and stocking soft goods and housewares; (e) using stepladders in the performance of miscellaneous stocking and other activities; (f) loading merchandise on L carts in the warehouse area and pushing them to the merchandise area; (g) occasionally removing boxes of merchandise from the warehouse conveyor belt; (h) straightening empty boxes accumulating near the vicinity of the check-out counters; (i)

returning and shelving merchandise which accumulated in the area of the check-out counter; (j) occasionally assisting in breaking down the produce department; (k) substituting for male employees in the produce department; (l) assisting in removing window signs at the front window.

The amount of time spent off the register in the performance of additional activities was approximately the same for both female checkers collectively and male clerk-checkers collectively. The amount of effort required to be expended in cashiering was at least equal to the effort expended in the performance of subsidiary activities by male and female employees. Considering all the subsidiary activities actually performed on occasion by front-end clerk-checkers, neither the time expended for performance, nor the nature of the additional tasks actually performed introduce any substantially greater skill, effort, or responsibility into the front-end clerk-checker jobs than to the checker jobs.

■ Substantially equal jobs can, of course, involve some differences particularly in subsidiary or detailed tasks, as they do here. Where the primary duties are essentially the same, differences in detailed subsidiary tasks do not render them unequal, absent a showing that performance of the subsidiary tasks requires significantly greater over-all skill, effort or responsibility than is required for the performance of the common primary functions. *Wheaton,* supra.

■ The discriminatory differentials paid the men were not justified. See Hodgson v. Robert Hall Clothes, Inc., 326 F.Supp. 1264 (D.Del., decided April 16, 1971).

■ The law in this circuit is that once plaintiff has established his prima facie case that there was a wage differential between males and females for identical or equal work, the burden shifts to defendant to prove that some nonsexual factor warrants the differential. The plaintiff has met his burden but the

defendant has not done so. *Wheaton,* supra.

■ The plaintiff is entitled to the injunctive relief sought and is also entitled to interest on underpayments, computed from the median point of accrual of underpayments as to individual employees. Shultz v. Wheaton Glass Co., 319 F.Supp. 229 (D.N.J., 1970), and Hodgson v. American Can Company, 440 F.2d 916 (8th Cir. 1971).

This opinion embodies the court's conclusions of law. Supplemental Findings of Fact are filed herewith. Counsel shall submit an appropriate injunctive order within thirty days.

## SUPPLEMENTAL FINDINGS OF FACT

1. The Secretary of Labor has sued under § 17 of the Fair Labor Standards Act (Act of June 25, 1938, 52 Stat. 1060, as amended; 29 U.S.C. 201, et seq.), to enjoin the defendant corporation from violating the equal pay provisions of the statute and to restrain the withholding of unpaid back wages resulting from the alleged violations of these provisions accruing since June 11, 1965. (Stipulation, ¶ 1—references hereinafter to stipulation refer to Stipulation of Counsel entered into on March 1, 1971).

2. Defendant Food Fair Stores, Inc. is a corporation organized under and existing by virtue of the laws of the Commonwealth of Pennsylvania, with its registered office at 3175 John F. Kennedy Boulevard, Philadelphia, Commonwealth of Pennsylvania, and operating several hundred establishments in several states, including establishments operated at Clarks Valmont Plaza, West Hazleton, Luzerne County, and Meridian Avenue and Luzerne Streets, Scranton, Lackawanna County, both in the Commonwealth of Pennsylvania, and both within the jurisdiction of this court. (Stipulation, ¶ 2).

3. The defendant corporation at all times relevant herein has been engaged in the operation of retail food supermarkets at said establishments at West

Hazleton and Scranton and the defendant has employed individuals there in ordering, handling, unloading, stocking, paying for and keeping books with respect to goods received in interstate commerce from out-of-state sources (Stipulation ¶ 3).

4. The business activities of the defendant corporation involving the operation of retail food supermarkets are related and performed through unified operation and common control and for a common business purpose, and constitute an enterprise within the meaning of section 3(r) of the Fair Labor Standards Act. At all times relevant herein the annual gross volume of sales of the enterprise was and is not less than $1 million, exclusive of excise taxes at the retail level separately stated, and the enterprise purchased and received and purchases and receives goods for resale that move or have moved across state lines which amount to a total annual value of $250,000 or more. (Stipulation, ¶ 4).

5. Both stores operated by defendant at West Hazleton and Scranton, are unionized and covered under collective bargaining agreements with the Retail Clerks' International Association, AFL-CIO, Local Union 1087. The 1963–1965 collective bargaining agreement effective between March 3, 1963, and September 5, 1965, contained separate wage schedules for male and female employees categorized as *"clerks"*. (Stipulation, ¶ 5).

Full time employees were considered as employees working at least a 40 hour workweek under the collective bargaining agreement. Full time male clerks were employed on a salary basis of $64 a week and received increments every 6 months and at the end of a 2½ year period received $91 a week salaries. Full time female clerks commenced at a salary of $62 a week and received increments every 6 months until achieving an $83 weekly salary after 2½ years' employment.

Part time male clerks were employed at $1.50 an hour, after 6 months received $1.55 an hour, 6 months thereafter $1.60 an hour, 6 months thereafter $1.70 an hour, 6 months thereafter $1.80 an hour, and 6 months thereafter received the last increment to $1.85 an hour; conversely, part time female clerks begin employment at $1.40 an hour, 6 months thereafter receive $1.50 an hour, 6 months thereafter $1.60 an hour, 6 months thereafter $1.65 an hour, 6 months thereafter $1.70 an hour, and 6 months thereafter received the last increment to $1.775 an hour.

There was only the classification of clerks, segregated either male or female, and either full time or part time, in the 1963–1965 collective bargaining agreement (a separate classification of head cashier, non-food department heads, male or female, contained in that agreement is not involved in this litigation). (Stipulation, ¶ 5).

6. The 1965–1968 collective bargaining agreement effective from September 5, 1965, to July 6, 1968, preserved the 10¢ per hour differential for part time employees and the salary differential for full time employees between males and females, but dropped the male and female designation of clerks, and adopted the classification of *"checker"* and *"clerk-checker"*. This same pattern of separate and lower wage schedules for female checkers as opposed to male clerk-checkers continues in the 1968–1971 agreement effective from July 7, 1968, to July 3, 1971. (Stipulation, ¶ 6.)

7. At all times since the effective date of the 1965–1968 collective bargaining agreement, only male employees have been employed in the classification of *clerk-checker* and only female employees have been employed in the classification of *checker* at defendant's establishments located at West Hazleton and Scranton. (Stipulation, ¶ 8).

8. Although the classification of "clerk" segregated into either male or female categories in the 1963–1965 contract was changed to separate classifications of checkers and clerk-checkers under all subsequent collective bargaining agreements, the duties and job contents remained substantially the same. (Plaintiff's Exhibits A1, 2, and 3; 1 TR 72, 228, 2 TR 85). (References hereinafter to Transcript first indicate the transcript volume, as either Volume 1 report-

ing proceedings on March 22, Volume 2 reporting March 23 proceedings, and Volume 3 reporting March 24 proceedings.)

The redesignation of the jobs eliminating separate male and female categories was effected with no concurrent material change in job content (2 TR 85, 1 TR 51, 2 TR 40).

9. Males engaged in the classification of *clerk-checker* and females engaged in the classification of *checker* spent most of their time in cashiering operations checking purchases by customers at cash registers at the front of the establishments. (Stipulation, ¶ 8).

10. At each of the separate establishments, the procedures utilized, the merchandise handled, the responsibility for merchandise and monies handled, and all other aspects of the jobs performed either by checkers or clerk-checkers while performing cashiering functions at registers were identical. (Stipulation, ¶ 8; 1 TR 118, 143, 191, 218, 2 TR 40, 76).

11. Customers at establishments would select merchandise, place merchanise in carts, and bring the merchandise to the front of the establishment where the check-out counters were located. There were approximately six to eight check-out counters at various intervals during the relevant period at each of the establishments. Customers would remove the merchandise from the carts and place the merchandise on the check-out counter, where the merchandise would be totaled on the cash register by the employee and then placed in bags by the employee, except on limited occasions when the stores were extremely busy and other employees helped in bagging. (Stipulation, ¶ 9).

12. On some infrequent occasions, because of such factors as the age of customers or at the request of customers, checkers removed or assisted customers in removing merchandise from shopping carts to the check-out counter. (2 TR 97).

13. Baggers, employees who worked in the cash register area placing merchandise in bags after being totaled by either male or female cashiers, per-formed this work indiscriminately for both male and female employees engaged in cashiering when the check-out areas were busy. (Stipulation, ¶ 9).

14. Grocery bags packed and lifted continuously by checkers and clerk-checkers weighed approximately 20 to 35 lbs. (1 TR 32, 72, 101, 130, 2 TR 25, 48, 97, 140).

15. Individual checkers and clerk-checkers packed and handled as many as 50 grocery bags an hour (1 TR 33, 101, 2 TR 35).

16. Checkers placed merchandise in boxes as well as in bags. These filled boxes generally were heavier than filled grocery bags and weighed approximately 30 to 40 lbs. (1 TR 59, 2 TR 25, 49).

17. The loaded boxes were handled frequently by checkers and clerk-checkers. (1 TR 68).

18. Both male and female employees engaged in cashiering placed filled bags and filled boxes into customers' carts (Stipulation, ¶ 10; 1 TR 59, 68, 99, 2 TR 25, 49).

19. The operation of the cash register, including the operation of the keys and the conveyor foot pedal and the packing and boxing of merchandise, requires some considerable physical effort from both the checker and clerk-checkers. The required physical effort caused strained back and chest muscles, and substantial fatigue and exhaustion (1 TR 31, 69, 73, 102, 103, 2 TR 27, 65, 98, 102, 139).

20. All merchandise and food products were marked with prices, and there was a list of daily and weekly specials maintained at cash registers available for both the male and female cashiers. Both the male and female employees while performing cashiering and check-out work had identical responsibility for acceptance and distribution of miscellaneous coupons and trading stamps. (Stipulation, ¶ 13; 1 TR 34, 99).

21. Checkers and clerk-checkers were responsible for checking the bottoms of shopping carts so as to be assured that all merchandise was correctly checked and accounted for at the register. In some instances heavy merchandise was

lifted from the bottom of the shopping cart by checkers and clerk-checkers and placed on the check-out counter. (1 TR 31, 72).

22. Male and female employees engaged in cashiering operations at the cash registers were held financially responsible by defendant for all cash register shortages, but received no credit or remuneration for any overages. (Stipulation, ¶ 21).

23. The combination of the exhausting physical effort with the mental effort attendant to the operation of the register was considerable.

24. The work of the clerk-checkers and checkers while performing at the cash register was identical, required substantially equal skill, effort, and responsibility and was performed under similar working conditions. (Stipulation, ¶ 14).

25. In addition to cashiering activities, female checkers were specifically assigned and performed miscellaneous subsidiary activities such as:

25.01 Stocking candy, cigarette and tobacco racks (1 TR 43, 78, 80, 2 TR 69 as to Scranton, and 2 TR 29, 153, 155 as to Hazleton).

25.02 Straightening, stocking, and ordering drug supplies and spices, including unloading and lifting crated drug supplies weighing approximately 50 to 60 lbs., lifting and placing boxes and crates of drugs onto carts, marking drug supplies prior to shelving, checking and shelving drug supplies (1 TR 40, 2 TR 69, 70, 72 as to Scranton and 1 TR 131, 2 TR 34, 51 as to Hazleton).

25.03 Collecting shopping carts from the interior of the establishments, joining as many as ten and pushing them approximately 30 ft. to areas at the interior front of the establishments where the carts are stored for customers (Stipulation, ¶ 11; 1 TR 47, 74, 2 TR 74, 100 as to Scranton, and 1 TR 213 as to Hazleton).

25.04 Collecting carts from the exterior of the establishments including parking lot area, and returning carts to storage area (1 TR 95, 144, 2 TR 110 as to Scranton, and 1 TR 144 as to Hazleton).

25.05 Unpacking, marking, and stocking housewares and soft goods, including carpeting, towels, and socks, resulting in lifting and dragging boxes of merchandise weighing in excess of 40 lbs. (1 TR 36, 37, 2 TR 72, 99 as to Scranton, and 1 TR 108, 110, and 2 TR 153 as to Hazleton).

25.06 Using step ladders in the performance of miscellaneous stocking and other activities (1 TR 40 at Scranton, and 1 TR 109, 2 TR 33, 153, and 154 at Hazleton).

25.07 Loading merchandise on L carts and pushing L carts from the receiving warehouse area at the rear of the establishments to the merchandising area of the establishments. The L cart is a low dolly on wheels with an upright handle used for pushing or pulling. Merchandise such as housewares, soft goods and drug supplies were thus transported by some of the checkers with as many as 20 boxes of approximately 20 lbs. each placed on L carts. In some instances dollies handled by checkers were loaded over five feet high (2 TR 71, 99, 135 as to Scranton, and 1 TR 105, 106, 124, 2 TR 32, 35, 42, and 157 as to Hazleton).

25.08 Cleaning and scrubbing the cash register check-out areas, delicatessen frozen food counters, freezer cases, houseware shelves, miscellaneous shelves and moldings, and offices and floors (1 TR 45, 212, 2 TR 71, 99, 136 as to Scranton, and 1 TR 112, 132, 2 TR 32, 33, 34, 152, 153 as to Hazleton).

25.09 Occasionally removing boxes of merchandise from the warehouse conveyor belt (2 TR 99, 104, 142).

25.10 Piling in an orderly fashion empty boxes which had accumulated at the front of the establishments in the vicinity of the check-out counters. (1 TR 79, 2 TR 112, 135 at Scranton, and 1 TR 213, 2 TR 36 at Hazleton).

25.11 Returning to the proper shelf merchandise which had been brought to the area of the check-out counter by customers and abandoned by such cus-

tomers. (Stipulation, ¶ 12; 1 TR 80, 2 TR 136 as to Scranton, and 1 TR 132, 2 TR 29, 30 as to Hazleton).

25.12 Occasionally assisting in the removal of perishables from the produce counter at the end of the day, placing the same into carts and moving the same into the freezer. (This is called "breaking down" of the produce department). (2 TR 112 and 138).

25.13 Weighing produce on the scales at the produce department (Stipulation, ¶ 15) and occasionally replacing male employees at the produce department. (1 TR 44, 81, 100, and 101).

25.14 Assisting in the removal of window signs hung on the front windows at the Scranton establishment (2 TR 122).

26. Although some additional tasks may have been performed by some of the male clerk-checkers for relatively nominal amounts of time during the workweek, neither the time expended for performance nor the nature of the additional tasks performed introduced any substantially greater skill, effort, or responsibility into the male clerk-checker jobs as opposed to the female checker jobs.

27. Clerk-checker Salvatore Checko unloaded only one truck during approximately 15 months of employment at the establishment, engaged in no snow removal and no icing of the produce counter, "broke down" the produce counter only six times during the period of his employment, helped with window signs approximately once every two months, changed no light bulbs, performed no mopping of floors, and performed no work in the managers' office (1 TR 221–227).

28. Clerk-checker Joseph Honcharik employed at the Scranton establishment for forty-five months hung window signs approximately one-half hour a week, iced the produce counter once, changed no light bulbs, did no snow removal, relieved grocery clerks three or four times, never mopped or cleaned rest rooms, and never used an L cart. (2 TR 6–19).

29. Ross J. Mosser engaged as a clerk-checker at the Hazleton establishment since approximately 1966 unloaded trucks approximately four to six times, performed stock work rarely, performed no icing and no changing of signs, changed light bulbs about every six months, performed parcel pick-up work occasionally, performed snow removal five times in two years, and over a period of the last three years spent approximately 90% of his time at the register. (1 TR 64–176).

30. Other clerk-checkers at both the Scranton and Hazleton establishments engaged in no unloading of trucks (1 TR 197) and engaged infrequently at best in the use of L carts (1 TR 200).

31. There were wide variances in the percentages of time spent by both individual female checkers and individual male clerk-checkers off the register.

32. The amount of time spent off the register in performance of additional activities was approximately the same collectively for both female checkers and male clerk-checkers. (1 TR 243).

33. Part-time checkers at the Scranton establishment worked at the register between 57% and 88% of the time. (1 TR 36, 180).

34. Part-time checkers at the Hazleton establishment worked the registers the following percentages of their time (depending on the particular periods of employment and the number of hours worked):

50% (1 TR 135)
53% (2 TR 150)
60% (2 TR 24, 29)
67% (1 TR 134)
79% (1 TR 104)
83% (2 TR 150)
89% (1 TR 212)

35. Full-time checker Mary Stanczyk at the Scranton establishment worked approximately 48% off the register (2 TR 168).

36. Full-time Josephine Siciliano worked approximately 35% of her time off the register (2 TR 66).

37. While in a checker category and compensated as a checker until approximately May, 1968, full-time employee Mary Stanczyk at the Scranton establishment worked approximately 48% of her 40-hour workweek performing head cashiering operations (2 TR 167–176). While performing the work of the head cashier, this female employee was responsible for cashing checks, checking the cash drawers of the checkers and clerk-checkers, checking register tapes, and totaling checks and making deposits.

38. Full-time clerk-checker Daniel Lucas spent approximately 90% of his time at the register (3 TR 166), and Robert Mandak at Hazleton spends approximately 80% of his time now at the register (3 TR 213).

39. Full-time male checker Lucas performed no additional tasks which approximated in responsibility that of the head cashiering tasks performed by Mary Stanczyk, but nonetheless received a higher wage.

40. At the Scranton and Hazleton establishments several part-time clerk-checkers spent only limited time off the register in other subsidiary activities (1 TR 220, 163, 2 TR 7, 3 TR 256, 1 TR 191, 243).

41. The parcel pick-up operation which involved loading bags into customers' cars and returning carts from the parcel pick-up and parking areas was the main subsidiary task performed by the male clerk-checker employees off the register.

42. Clerk-checkers performing cashiering functions performed very little parcel pick-up activities. (1 TR 114, 115, 132, 2 TR 75, 76, 112, 113).

43. The bags and boxes handled in the parcel pick-up operations were the same bags and boxes handled by the clerks and clerk-checkers at the registers.

44. The amount of physical effort required in parcel pick-up operations was no greater than the amount of physical effort required in the performance of cashiering operations as described. (1 TR 169, 196, 221, 238, 2 TR 7, 8, 13).

45. The combined physical and mental effort required in the performance of cashiering operations as described was substantially greater than the combined physical and mental effort required in the performance of the parcel pick-up operations (1 TR 169, 196, 208, 221, 238, 2 TR 7, 8, 13).

46. Parcel pick-up activities performed by some of the clerk-checkers represented inconsequential activities additional to the principal cashiering functions and introduced no additional element of skill, effort, and responsibility into the basic cashiering positions.

47. Although under the 1965–1968 and 1968–1971 collective bargaining agreements operative at defendant's establishments, the only male category was "checker", nonetheless there were well established practical classifications of employees as grocery clerks, produce clerks, and cashiers (clerk-checkers principally engaged in operating cash registers). (1 TR 153, 154, 161, 223, 2 TR 17, 52, 3 TR 174, 175, 224, 225, 227, 229, 252).

48. The primary job of grocery clerks was bringing merchandise from the stock room at the rear of the establishments and stocking shelves. (See citations at No. 47).

49. These grocery clerks also engaged in unloading trucks and placing goods in the stock room.

50. Merchandise was delivered to defendant's establishments by truck during the day, except for very isolated instances, and would be unloaded by grocery clerks and produce clerks.

51. Part-time clerk-checkers working evening hours at defendant's establishments had little or no occasion to help in unloading trucks.

52. Produce clerks were responsible for icing of produce, stocking of the produce counters, weighing and performing such additional tasks as making orange juice. (See citations at #47.)

53. Grocery clerks and produce clerks, notwithstanding the fact that they were employed under the general category of

clerk-checkers under collective bargaining agreements operative since 1965 nonetheless performed substantially no cashiering operations at cash registers until approximately the beginning of 1970.

54. Beginning in approximately January, 1970, grocery clerks and produce clerks were changed to front end work such as operating cash registers. (3 TR 229).

55. Employees referred to in the preceding paragraph were moved to front end operations as a result of gradual reduction of volume of business at the establishments, with a concurrent substantial reduction in the number of hours worked by other checkers and clerk-checkers theretofore performing register cashiering operations.

56. Several of the employees almost exclusively engaged in grocery and produce activities did not know how to operate registers until after the gradual diminution of business which, coupled with the seniority system for the layoffs operative at the establishment, required their moving to front end operations.

57. There are male clerk-checkers performing register cashiering operations almost exclusively.

58. Clerk-checkers who previously were engaged in work as produce clerks or grocery clerks when moved to front end operations spent substantially all their time in cash register operations.

59. Some male employees who moved from grocery or produce classifications to clerk-checker cash register cashiering at the beginning of 1970 have spent approximately 90% of their time at the register. (3 TR 166).

60. Defendant claims to have established wage differentials favoring clerk-checkers because of an alleged flexibility of clerk-checkers as a group.

61. Some individual clerk-checkers performed substantially none of the subsidiary activities.

62. The subsidiary activities performed by several female clerks were as great in time and skill, effort and re-sponsibility as that spent by the male clerk-checkers in such activities.

63. Defendant acknowledged that individual female checkers performed subsidiary tasks away from the register requiring at least as great physical effort as those subsidiary tasks performed by clerk-checkers away from the register (2 TR 210).

64. As with all subsidiary activities performed by female clerks or male clerk-checkers, starting rates were established and the salary and hourly rate wage progressions were automatically implemented, without regard to the nature and frequency of the performance of the activities other than cashiering. (Stipulation, ¶ 16.)

65. There were no written job descriptions prepared with respect to the male or female clerks' positions under the 1963–1965 collective bargaining agreement, nor to the male clerk-checker and female checker positions under the subsequent collective bargaining agreements. The collective bargaining agreements themselves do not describe the duties and functions of these positions. (Stipulation, ¶ 22).

66. Defendant established no objective standards for measuring either the nature or degree or frequency of performance of asserted subsidiary activities by individual clerk-checkers as justifying their wage differential.

67. There is no indication that there was any periodic evaluation of the activities performed by clerk-checkers by defendant's management representatives so as to compensate them for such additional activities.

68. No evidence was introduced by defendant as to the relative "economic benefit" assertedly secured from the performance of subsidiary activities by clerk-checkers as a group or individually as opposed to any "economic benefit" secured from performance of subsidiary activities performed by female clerks either individually or as a group.

69. Both the male and female employees, when not physically operating

the cash registers as previously described, occupied themselves with miscellaneous subsidiary activities.

70. If the female checkers were not available to perform miscellaneous additional activities as described in the preceding paragraphs, defendant would have been required to hire additional employees to perform these additional activities. (2 TR 41, 47).

71. Defendant secured at least as great an economic benefit from the cashiering operations performed by female checkers as from asserted subsidiary tasks performed by male clerk-checkers off the register.

72. Training of clerk-checkers and checkers at the commencement of employment was of short duration, and involved a general familiarization with procedures and the operation of cash registers, and was the same for both categories of employees. (1 TR 27, 65, 98, 126, 191, 219, 235, 2 TR 5, 24, 46, 62, 93, 131, 165).

73. The miscellaneous activities in addition to cashiering performed by front end *clerk-checkers* introduced no additional element of skill, effort, and responsibility into the basic cashiering positions.

74. When the jobs of male front end *clerk-checkers* and female *checkers* are viewed from their entire work cycle, the jobs are substantially equal in terms of skill, effort, and responsibility.

75. Subsidiary tasks performed by female *checkers* require substantially equal skill, effort, and responsibility as the subsidiary tasks performed by the male front end *clerk-checkers*.

76. Individual male employees engaged principally in activities other than cashiering received no higher rate of pay than male employees engaged principally in cashiering operations.

77. There is no greater economic benefit to the defendant from the activities other than cashiering performed by one category of employees over that derived from activities of the other category of employees.

78. Wage differentials paid full and part-time clerk checkers at defendant's Scranton and West Hazleton establishments were not payments made pursuant to (i) a seniority system; (ii) a merit system; (iii) or a system which measures earnings by quality or quantity of production. (Stipulation, ¶ 17.)

79. At all times since June 11, 1965, part-time female checkers and part-time male clerk-checkers engaged at defendant's West Hazleton store were engaged in equal work on jobs the performance of which required equal skill, effort, and responsibility under similar working conditions.

80. At all times since June 11, 1965, part-time female checkers and part-time male clerk-checkers engaged at defendant's Scranton store were engaged in equal work on jobs the performance of which required equal skill, effort, and responsibility under similar working conditions.

81. At all times since June 11, 1965, full-time female checkers and full-time male clerk-checkers engaged at defendant's West Hazleton store were engaged in equal work on jobs the performance of which required equal skill, effort, and responsibility under similar working conditions.

82. At all times since June 11, 1965, full-time female checkers and full-time male clerk-checkers engaged at defendant's Scranton store were engaged in equal work on jobs the performance of which required equal skill, effort, and responsibility under similar working conditions.

83. Back wages attributable to pay inequalities between male clerk-checkers and female checkers at the Scranton store are as follows (Stipulation, ¶ 18, plaintiff's Exhibit 11):

| Name | Period Covered | Amount Due |
|------|----------------|------------|
| Rose DeStefano | 6/26/66–8/29/70 | $623.07 |
| Caroline James | 6/26/66–8/17/66 | $ 24.70 |
| Arlene M. Lombardo | 6/26/66–9/28/68 | 333.44 |
| Josephine Mendola | 6/26/66–8/29/70 | 623.07 |
| Josephine Siciliano | 6/26/66–12/2/66 | 180.31 |
| Mary C. Stanczyk | 6/26/66–5/11/68 | 881.05 |
| | | $2,665.64 |

84. Back wages attributable to pay inequalities between male clerk-checkers and female checkers at the Clarks Valmont Plaza, West Hazleton Store are as follows (Stipulation, ¶ 19 and ¶ 20, Plaintiff's Exhibit 11):

| Name | Period Covered | Amount Due |
|------|----------------|-----------|
| Nancy M. Bobey | 6/26/66–1/28/67 | $ 53.10 |
| Elnora M. Faust | 6/26/66–9/ 6/69 | 391.13 |
| Catherine Henry | 6/26/66–3/25/67 | 77.50 |
| Ruth V. Jacoby | 6/26/66–3/23/68 | 113.70 |
| Ruth A. Toth | 6/26/66–9/18/69 | 389.55 |
| Wanda Zola | 6/26/66–8/29/70 | 465.00 |
| | | $1,489.98 |